# Knupp, Appellant, v. Barnard.

*Land law—Surveys—Warrants—Boundaries.*

The marks of a block consist of the marks, if such are found, of every tract of the block, and the marks if originally intended as corners for a particular tract become marks for locating the whole block.

. The location of a block of surveys may be established from a single undoubted monument of the block on the ground if there be no others, by the courses and distances in the return; the interior tracts must then be located relatively wholly from the return of the block; but the return may show marks for corners of the interior tracks; if these be found upon the ground they establish the lines of these interior tracts although this may

to some extent disturb the lines of the block; such a location of an interior tract of a block although it may somewhat change the course of the exterior line as plotted in the return or shorten that line running from the leading warrant, yet giving effect to that fact, does not disregard the established rule, that a member of a block cannot be wrested from its position and be located outside of it; it is not thereby wrested from the block but its position is relatively the same as in the return although one of the exterior lines of the block has been for a short distance deflected from its course to accord with the established monuments on the ground of the interior tract common to it and the block of which it is a member; but there can be no block of surveys in either a popular or legal sense where the tracts are not contiguous.

In a land case where the location of two contiguous tracts of a block depends upon the position of an interior line of the block, and the evidence as to the marks of early surveys is conflicting, the case is for the jury.

Argued May 4, 1903. Appeal, No. 191, Jan. T., 1902, by plaintiff, from judgment of C. P. Warren Co., March T., 1901, No. 34, on verdict for defendants in case of W. J. Knupp v. Frank B. Barnard and E. Pequignot. Before DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Ejectment for land in Triumph township. Before LINDSEY, P. J.

The court charged in part as follows:

[Now, gentlemen of the jury, the question which you are to determine is where this land is located. The plaintiff claims that the Jacob Kortman tract and the Henry Bozar tract, and in fact all of these tracts should be located by what is known or termed in law a block survey. You will understand by this, that in the early settlement of this state, and in the early acquisition of titles, a person who desired to obtain title to a certain quantity of land made application to the commonwealth and filed his application in the land office, and while he himself was not able to obtain more than a certain quantity of land, he made application in the name of others, in the name of different members of his family and other persons, for the quantity of land which he desired, and the rights of the nominal applicants were transferred to the person making the application, and thus one person was enabled to obtain a large number of warrants of land. In this case James Wilson applied for a large number of warrants, much larger than is represented on

the plaintiff's map, and those warrants were placed in the hands of the deputy surveyor, Alexander McDowell, whose duty it was to go and survey those warrants upon the ground. His duty was as we understand the law to survey each one of those warrants and mark them on the ground, but that was not always done, sometimes the deputy surveyor only ran the outward lines of a block of warrants and then when that was done that became a block in the legal acceptation of the term. Where a large number of warrants or batch of warrants were run and marked on the ground, in addition to running the exterior lines of the block, it became and was called a block in the popular sense of the term.]

[To bring this definition more clearly before you I desire to refer to the definition of blocks as defined by the late Judge WILLIAMS of the Supreme Court, in the case of Ferguson against Bloom, 144 Pa. 549. Judge WILLIAMS was known to be an able land lawyer, and speaking of the manner in which warrants were granted by the commonwealth and the manner in which the surveys were made, he states : " When more land was desired than could be included in one tract, the person wishing to buy made application in the names of the members of his family, his servants and employees, as well as his own. When this happened, the deputy surveyor would sometimes locate the entire batch of warrants in a body, as one tract, and such a body of surveys, made at one time, for one owner, was called a block." If the surveyor discharged his duty, and marked the lines of each tract, the word " block " was sometimes used to describe the body of lands held by one owner ; but in such cases the location of the tracts comprising the block was made on what may be called the individual system. If only exterior lines of the block were marked, the location of the separate tracts was practicable only upon what we have called the " block system." Further defining these two systems, he says : " If no tract corners are marked on the block lines, they must be run in accordance with the returns of survey. If corners are to be found on the block lines, these will control the courses and distances given in the returns, and the interior lines must be protracted across the block in accordance with them." Further he states : " In Mock v. Astley, 13 S. & R. 382, it was said a foundation for its application in any given case must be

laid by showing two facts : First, the existence of a block must be established ' by the production of documents showing title to the whole body. This shows a grant by the commonwealth of her title to the whole body composing the block. Next, the evidence must show that the tracts composing the alleged block were located in a body without interior lines.' " After reciting other cases, he says : " Upon the authority of these cases, and upon the principle, it is clear that if there are any interior lines on the ground they are of equal value with external ones, as they are equally the ' footprints of the surveyor,' made at the location of the tracts, and for interior members of the block. The general rule is that when there is work on the ground, made for and peculiar to a given tract, such work will control the location of the tract and fix the places of its lines." Again, " We have thus two systems for ascertaining the proper location of a survey ; the natural and general one, which rests on such of the original marks made for the tract as can be found, and on the legal presumption arising from the return of survey as to such as cannot be found ; and the block system, which is applicable where no internal lines were run, and where, therefore, no marks exist to guide in the location of internal tracts or lines, except such as may be found on the exterior of the block."]

[Now, gentlemen of the jury, from the definitions which I have read to you from the decision of the Supreme Court in Ferguson v. Bloom, which is almost the last case in which the systems are clearly defined by the Supreme Court, you will see that a legal block, in the legal sense I mean now, is where the exterior lines only are run and marked upon the ground. However, in the popular sense in which a block is used, it may be used where not only the exterior lines of the block or batch of surveys are run and marked upon the exterior lines, but the warrants themselves, composing the batch of surveys, the lines or corners are marked, and sometimes the lines are run upon the ground.]

With these definitions in mind let us turn to what is called here by the plaintiff a block of surveys, and see to which of these systems it belongs. The plaintiff has furnished us with a certified copy of a connected draft of warrants lying between the Randolph Spangler on the north and the James Murray on

the south. His map, which you see before you, goes farther in the block than this connected draft, and his surveys went farther north, or up the Allegheny river, than the Randolph Spangler warrant. This connected draft, and the same thing is shown by the copies of the separate warrants, shows the courses and distances running south along the Allegheny river, along all of these warrants. It shows the corners for the warrants marked by trees named in the surveyor's return of survey on a large number of the warrants, on the east along down the Allegheny river. I think there are seventeen of the warrants shown on this connected draft and some ten of them contain calls for marked trees. On the west there are still more calls for marked trees at the corners of these respective blocks, and I think only three of the warrants are without calls for corners.

[From these facts, gentlemen, it would appear that this batch of warrants as laid out by the deputy surveyor and as returned by him into the land office would not fall within the definition of a legal block. Because of these calls for marked trees along on these, separate warrants were actually made by the surveyor upon the ground, then many of these warrants, if not all of them, could be located by marks upon the ground. If this batch of surveys then are to be treated, in the location of one of the warrants, as a block in the legal acceptation of a block, it is because these corners cannot be found now upon the ground sufficient to locate the warrant under consideration.] [4]

The plaintiff has called a number of experienced surveyors who have made a survey not only of the warrants to which we have called your attention but also of other warrants in the same batch, lying to the north. They have testified to finding a hemlock tree, which is now down, but the stump or butt of the tree has been blocked and it counts back to the survey made by Alexander McDowell of these batch of warrants in 1795. That is at the north corner of the Randolph Spangler as you see it upon the map. The surveyors have gone north and have found one or more trees or marks, as I recollect it, north of that, which counted back to 1795. Coming back to the hemlock, the northwest corner of the Randolph Spangler, the surveyors on the part of the plaintiff have traced a line

from that point in a southerly direction or south along these various warrants to the James Murray tract or warrant. They testified, all of them I think, that they found no marked corners which go back to the survey of 1795 on that line.

The plaintiff has also given in evidence copies of surveys made of warrants granted by the commonwealth to different persons, lying to the west, the Eben Owens, the David Beaty, the Michael Gorman and perhaps one other. And it is claimed that these warrants although junior, located at a later period of time from the James Wilson warrants, call for the James Wilson warrants, and call for the warrants, namely, the John Kortman, Peter Kortman, Henry Kortman, Isaac Kortman and Jacob Kortman. And that they having been surveyed by a deputy surveyor of experience, who was the county surveyor of this county for many years, A. H. Ludlow, is evidence of where these warrant are located, and evidence to support his claim that the warrants are located farther north than the defendants claim, and that the Henry Bozar is where the defendants claim the Jacob Kortman to be. And in the David Beaty survey it is claimed that the call is for the Henry Bozar. The words written at the east of the David Beaty on the survey are " D. Beaty," and that is the piece of land which lies in the western part of the Jacob Kortman, as placed upon the map of the defendants and that being in the Jacob Kortman it is claimed that this is a call for the Jacob Kortman. And taking the calls made by Andrew H. Ludlow, when he located the David Beaty and the Eben Owens, it is claimed on the part of the plaintiff that it supports his theory of the location of these lots.

[Now, gentlemen of the jury, if there are no marks upon the ground by which the Jacob Kortman and the Henry Bozar can be located, then we say to you that we think resort may be had to the principles applicable to a block; and locating these warrants in that way the Randolph Spangler is the oldest warrant; that is, not going farther north than that, and that is sufficient for the purposes of applying the principles of a block survey. That is the older survey. That calls for the John Kortman, which is the next one south; that must be located then south of the Randolph Spangler; and the principle invoked applies that after twenty-one years there is a legal presumption that the warrant has been located as returned by the deputy sur-

veyor.   That legal principle then would locate the John Kort-
man south of the Randolph Spangler, and so with each one
going south.] [5]

[But it is claimed on the part of the defendants that the
Jacob Kortman and the Henry Bozar warrants can be located
by marks found upon the ground, or the evidence of the marks
which the deputy surveyor made in 1795, which they have
given you.   The evidence which the defendants have produced
to support this is of a white oak, which white oak is called for
as the northwest corner of the Henry Bozar and the southwest
corner of the Jacob Kortman.

O. W. Beaty is produced as a witness and testifies that he
was on the ground with a surveyor named John Fuellhart in
1865, to run out the piece of land lying as shown by the
defendants' map in the western part of the Jacob Kortman
tract; and he says they went to a white oak tree which was
then standing, and started at that point, and from that white
oak they made the survey of what is termed the D. Beaty piece
of land, in the western part of the Jacob Kortman.   He states
that Fuellhart commenced his survey there; that he ran around
and marked that piece of land as described, that he had known
of the white oak tree being there upon the ground for some
time before that; that he had seen it when going to school.
If I remember correctly he states that it was marked with three
notches,—I don't know that he mentioned the number, but it
was marked with notches—and I think he said notches to the
north, to the south and to the east.   You will remember that,
gentlemen, for yourselves.

Mr. Henry Fuellhart is called, and he testifies that he was
on the ground later with his father, John Fuellhart, and that
they went to the same corner, same tree, and that his father
said that was the southwest corner of the Jacob Kortman war-
rant.   He states that his father said he had blocked it.   He
states that they ran a line through to the Allegheny river, per-
haps ran around the entire piece first and then ran south and
then ran a line through to the river.   You will remember what
he stated as to what he found upon that line.   And that his
father pronounced that the south line of the Jacob Kortman
tract.   Which should be, if it was, the north line of the Henry
Bozar, because they call for each other and must be located

together.   Now, gentlemen of the jury, I am not going to take
the time to go over all of this evidence, you must remember it
for yourselves.]  [6]

Title papers are given in evidence, deeds which have been
admitted in evidence, showing the declarations of parties who
had knowledge of the lines and parties who owned the lands.
Those deeds and the declarations have been commented upon
by counsel and we will not go over them.

[We say to you, gentlemen of the jury, if you find that the
white oak stump which is now found there upon the ground,
and which is testified to by a number of surveyors on the part
of the defendants, and it was also stated by O. W. Beaty—I
understand that that tree was cut down later after he was
there in 1865 with Mr. Fuellhart—if you find from all the evi-
dence that that white oak stump was of the tree marked by
Alexander McDowell as and for the southwest corner of the
Jacob Kortman and the northwest corner of the Henry Bozar,
then we say to you as a matter of law that the legal presumption
will attach; that is, the legal presumption that after twenty-one
years a survey is supposed to be on the ground as returned by
the deputy surveyor, and the line must be run from that stump
according to the courses in the return of survey to the Alle-
gheny river, and that would constitute the line between the
Jacob Kortman and the Henry Bozar and the line between
the plaintiff's and the defendants' land.   The Jacob Kortman
survey could be closed by the application of that principle.
The line would then be extended up the Allegheny river,
according to the courses and return of survey, and then west-
erly from the Allegheny river according to the courses until
it met a line extending northward from the white oak, accord-
ing to its courses, and thus the survey would be joined.
Now, gentlemen, this fact is for you.   We give no expression
at all as to what we might think about it.   We have no right
to.   The question is for you to determine.]  [7]

[The defendants in support of their position further give
evidence of a pine tree which is called for in the Robert Tol-
bert, as the northwest corner of the Robert Tolbert and as the
southwest corner of the William Tolbert.   Mr. Whittekin, an
experienced surveyor, is called as a witness, who testifies that
in 1882, he was making a survey for a man by the name of

Shamburg and he was at that pine tree; that he blocked it and counted it and it counted back to the survey of 1795. He states that he has been there since and that the tree is down, nothing there but the stump, and part of that stump has been brought here by the plaintiff, and you have heard the evidence that has been given in relation to it. The defendants have also given evidence of having run a line from that pine eastward to the Allegheny river, and finding no marks that dated back to the survey of 1795, but finding a marked line there. And this has been received in evidence as bearing upon the question whether that pine tree was the original tree, marked by Alexander McDowell.

Now, gentlemen of the jury, what are the facts in relation to that tree? Is that the tree? If so, then the Robert Tolbert and the William Tolbert could be located from that tree by applying the principle to which I have referred, and which was so clearly explained by Judge Furst, who last addressed you and who read from a decision of the Supreme Court. It is for you to determine these facts.] [8]

[It is claimed on the part of the defendants, and there is evidence to show that from the pine to the white oak there is sufficient distance to locate all the warrants between the Robert Tolbert and the Henry Bozar. The defendants have given evidence to show from measurements made by the surveyors, that between the white oak, the northwest corner of the Henry Bozar, and the white oak at the jog in the southwest corner of the Jacob Spangler, there is sufficient land to fill all of these warrants and considerable more.] [9]

As we have said to you, gentlemen of the jury, the lines and marks upon the ground, the corners marked upon the ground, are the highest and best evidence, and that courses and distances must give way to the actual markings made upon the ground, when they can be found or the existence of them can be shown by testimony which is satisfactory to the jury. The existence of these corners where they have disappeared must be proven by testimony which is clear and which is satisfactory to the jury.

Verdict and judgment for defendants. Plaintiff appealed.

*Errors assigned* were (1–9) above instructions, quoting them.

*A. O. Furst, D. I. Ball* and *J. W. Wiggins*, for appellant.

*W. E. Rice*, of *Hinckley & Rice*, and *W. W. Wilbur*, with them *Perry D. Clark*, for appellees.

PER CURIAM, May 18, 1903:

The contention in this issue turned on conflicting evidence as to the location of two tracts of land, the Henry Bozar and Jacob Kortman warrants surveyed and returned in 1795. Both were part of a large block of seventy-six warrants taken out in that year by James Wilson; it is conceded on both sides that their position in the block is that of contiguous tracts having as a division an interior line of the block which on the return of survey, as defendants claim, is a line running from a post on the Allegheny river, the eastern boundary of the block west 522 rods to a white oak marked on the return as a monument on the western line of the block; this then, by the return is also fixed as the southwestern corner of the Kortman and the northwestern corner of the Bozar. The plaintiff claimed title to about 125 acres, part of the Bozar; the defendants claimed the same land under the Kortman and the conflicting claims are determined by a proper location of the dividing line which defendants claim runs from the white oak to the river; the plaintiff claims that the white oak line is not the true interior line of division between the Bozar and Kortman, but that the true line is one tract north of it. There was a mass of conflicting evidence tending to establish each side of the controversy, and the question of fact was submitted to the jury by the learned judge of the court below in a very full and impartial charge; the jury found for defendants and plaintiff appeals preferring eighteen assignments of error.

We have examined them carefully and find no error which would warrant a reversal. Under no view of the evidence could the court have withheld it from the jury. Taking the general lines and return of the block as the evidence and the only evidence of the relative location of those two tracts the weight of it would probably sustain plaintiff's claim; but the marks of a block consist of the marks, if such are found, of every tract of the block, and the marks if originally intended as corners for a particular tract become marks for

locating the whole block. The simple question is, did the early surveyor in locating the block make the marks of these two surveys at that date as members of the block? He may establish his leading warrant by undoubted monuments maintained to this day; in running his long block lines from these monuments he may mark corners on these lines for the lines of interior tracts; in running these block lines now, it may be found that these corners are not just where designated in the block lines as returned; the distance from the leading warrant may be longer or shorter than that in the block line; it may not be in the exact course; but this variance of itself does not destroy its significance as a monument; it only demonstrates what is well known, the looseness and want of accuracy in the early surveyors, and the negligence exhibited by them in plotting and returning their surveys. In that day, land in Warren county was cheap; now the production of millions of dollars worth of oil from beneath it has made it very high priced, but nevertheless, we are compelled in ascertaining titles to take into consideration the loose methods of the early surveyors, otherwise we may make disastrous mistakes. Here, we do not undertake to decide that beyond doubt the line from the white oak to the river was the true dividing line between the two tracts; to our minds the evidence is not clear; but there was competent evidence adduced by defendants, that it was; the jury believed it as they had the right to do and we cannot disturb their verdict.

We do not concur in the distinction made by the learned judge of the court below between a popular block of surveys and a legal block. The location of a block of surveys may be established from a single undoubted monument of the block on the ground if there be no others, by the courses and distances in the return; the interior tracts must then be located relatively wholly from the return of the block; but the return may show marks for corners of the interior tracts; if these be found upon the ground they establish the lines of these interior tracts although this may to some extent disturb the lines of the block; such a location of an interior tract of a block although it may somewhat change the course of the exterior line as plotted in the return or shorten that line running from the leading warrant yet giving effect to that fact, does not dis-

regard the established rule, that a member of a block cannot be wrested from its position and be located outside of it; it is not thereby wrested from the block but its position is relatively the same as in the return, although one of the exterior lines of the block has been for a short distance deflected from its course to accord with the established monuments on the ground of the interior tract common to it and the block of which it is a member; but there can be no block of surveys in either a popular or legal sense where the tracts are not contiguous. It was not intended by us in Ferguson v. Bloom, 144 Pa. 549, nor in any other case to change or modify the law as long settled governing the location of a block of surveys and the different members of a block. While we do not concur with what the learned judge of the court below says on this subject, or rather his understanding of the language of the cases cited, we can only say that his instruction did plaintiff no harm, for he distinctly told the jury, that they must be controlled in their verdict by the evidence of the marks made in 1795 on the ground.

All the assignments of error are overruled and the judgment is affirmed.