## Pennsylvania Society for the Prevention of Cruelty to Animals *v.* Bravo Enterprises, Inc., Appellant.

Argued May 1, 1967. Before BELL, C. J., JONES,
EAGEN, O'BRIEN and ROBERTS, JJ. Decree reversed

352

June 30, 1967. Reargument granted October 3, 1967. Reargued November 30, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Martin Greitzer*, with him *Gene Locks, B. Nathaniel Richter*, and *Greitzer & Locks*, for appellant.

*W. Charles Hogg, Jr.*, with him *Richard H. Elliott, H. Thomas Felix, II*, and *Clark, Ladner, Fortenbaugh & Young*, and *Obermayer, Rebmann, Maxwell & Hippel*, for appellees.

OPINION BY MR. JUSTICE EAGEN, January 18, 1968:

This matter comes before the Court on the appeal of the defendant-appellant, Bravo Enterprises, Inc. (Bravo) from a final decree in equity issued by the Court of Common Pleas of Philadelphia County enjoining Bravo from conducting a performance known as "International Festival of Matadors and Bulls" (Festival), an exhibition of so-called "American style" bullfighting.

Prior to April 14, 1966, Bravo advertised its intention to present its performance at the Philadelphia City Arena on April 14 through 17, 1966. Plaintiff Pennsylvania Society for the Prevention of Cruelty to Animals along with intervenor Women's Society for the Prevention of Cruelty to Animals (S.P.C.A.) instituted this action to enjoin the performance alleging that such a performance would violate the precepts of the Act of June 24, 1939, P. L. 872 §942, as amended, 18 P.S. §4942 (Supp.). The complaint attempted to enjoin the performance without a hearing and based on affidavits alone. On April 12, 1966, the court below denied the motion for an ex parte injunction and fixed a hearing for April 15, 1966. One performance of the Festival was held on April 14, 1966, and the Chancellor, Judge EDWARD J. GRIFFITHS, was present at the performance.

At the hearing the following morning, testimony was presented by S.P.C.A., and the court heard oral argument following which it entered a decree enjoining until final hearing the further performance of the Festival.

A final hearing was held on June 9, 1966, in which the evidence previously offered was incorporated and additional testimony was offered by both parties. Subsequently, the court below entered a decree nisi, permanently enjoining further performance of Bravo's Festival. Following this the court en banc approved the chancellor's findings and made the decree final. Bravo appeals.

The chancellor's findings, having been approved by the court en banc, have the effect of a verdict of a jury, and an appeal is limited to the consideration of whether such findings are supported by sufficient evidence and whether the court below abused its discretion or committed an error of law. *Drummond v. Drummond*, 414 Pa. 548, 552, 200 A. 2d 887, 889 (1964);

*Reifschneider v. Reifschneider,* 413 Pa. 342, 344, 196 A. 2d 324, 325 (1964).

Bravo's first contention is that the Festival did not violate the terms of the applicable statute, 18 P.S. §4942, supra. That statute, in pertinent part, provides sanctions for anyone who ". . . [W]antonly or cruelly illtreats . . . any animal . . . or in any way is connected with, or interested in the management of, or receives money for the admission of any person to any place kept or used for the purpose of fighting or baiting any bull, bear, dog, cock or other creature, or encourages, aids or assists therein. . . ."

Bravo asserts that the bulls used in its Festival were not baited nor cruelly treated and that the performance did not actually constitute bullfighting.[1] We do not agree with this contention.

---

[1] Appellee sets out in its brief a succinct summary of the night's events as follows: "The performance began with a blare of trumpets . . . and the introduction of the matadors to the audience. The matadors were dressed in short jackets, waistcoats, knee-length trousers, stockings, black slippers and small black hats. A bull entered the ring and charged at a matador waving a red cape. The matador side-stepped the charging animal, again waving his cape and the bull recharged at him. The cape work, the charging of the animal toward the waving cape and the associated side-stepping continued for approximately five minutes. A trumpet signaled the end of the first part of the performance . . . others entered the ring carrying sticks about thirty inches in length. As the bull charged these men, they side-stepped the animal and the sticks were thrust near the neck of the bull to mark the end of the second phase of the performance. Trumpets again sounded to re-introduce the matador who carried a smaller cape separated by a wooden stick with a spike protruding from its end and a false sword. As in the first part of the performance, the bull repeatedly charged as the matador waved the cape and the animal was . . . prodded with the metal spike at the end of the cape support. The bull stopped charging after about five minutes and was then lured out of the ring by other matadors waving their capes at the animal from the exit. A second bull was brought out and the spectacle was repeated a second time." (Record directions omitted.)

As the lower court en banc stated, "the . . . contention of . . . Bravo . . . is that the exhibition which it conducted did not constitute 'bullfighting' within the classical meaning of that term. This, however, is not the issue. Rather, the issue is whether the exhibition conducted by defendant constituted 'fighting', 'baiting' or 'otherwise cruelly ill-treating' bulls" as those terms are used in the statute.

It is our view that, whether or not the legislature envisioned the classic bullfight of the Spanish-speaking world when it framed the "fighting any bull" facet of the cruelty to animals statute, the "baiting" and "otherwise cruelly illtreating" aspects of the act are susceptible to a wide sphere of interpretation. We will not say that the court below abused its discretion or committed an error of law when it placed the Festival presented by Bravo within that statutory ambit.

Bravo next contends that the S.P.C.A. went into equity "with unclean hands," in that the S.P.C.A. is aware of and does nothing to prevent the activities of harness racing, rodeos, and circuses in Pennsylvania, which Bravo asserts are similar to its Festival. This contention is meritless.

First, the record is devoid of any evidence with respect to violations of the cruelty to animals statute, supra, at harness racing events, rodeos, or circuses, or of the S.P.C.A.'s knowledge of any violations at these events.

Secondly, even if such evidence were to be found in the record, the bar of unclean hands is applicable only where the wrongdoing of the plaintiff directly affects the equitable relationship subsisting between the parties and is directly connected with the subject matter at controversy. *Goldberg v. Goldberg,* 375 Pa. 78, 86, 99 A. 2d 474, 478 (1953).

Bravo's third contention is that the court below sitting in equity improperly exercised jurisdiction in

this matter. This argument is grounded in the apparently case-made rule of law that equity will not act *merely* to enjoin the commission of a crime.

There have been two fairly distinct lines of cases in this Commonwealth dealing with what might be called the criminal arm of equitable jurisdiction. These cases have generally refused equity jurisdiction in the criminal area, but some notable and necessary exceptions have been carved out.

A. In one line of cases, one who has been charged with criminal acts has sought to enjoin a pending criminal trial from proceeding against him, usually asserting that he is innocent of the acts charged. Our cases hold that equity may not take jurisdiction in such a situation, on the ground that the law and sound public policy are better served by not permitting equity to control the prosecution, punishment and pardon of crimes.[2] Thus a potential defendant is precluded from having a chancellor adjudicate his guilt or innocence via a suit to enjoin his prosecution. See *Douglas v. City of Jeanette*, 319 U.S. 157 (1943); *In re Sawyer*, 124 U.S. 200 (1888); *Cooper v. McDermott*, 399 Pa. 160, 163 159 A. 2d 486, 489 (1960); *Meadville Park Theatre Corp. v. Mook*, 337 Pa. 21, 24, 10 A. 2d 437, 439 (1940); *Long v. Metzger*, 301 Pa. 449, 454-455, 152 A. 572, 573 (1930); *Martin v. Baldy*, 249 Pa. 253, 258-259, 94 A. 1091, 1093 (1915); *M. & S. Ry. & L. Co. v. New Castle*, 233 Pa. 413, 418, 82 A. 501, 502 (1912); *Bryan v. City of Chester*, 212 Pa. 259, 262, 61 A. 894, 895 (1905).

However, two general exceptions to this rule have been developed by our courts. Thus, equity will lie to restrain a pending criminal prosecution if it is alleged that: (1) The available legal remedy will cause a

---

[2] For this type of case, the maxim usually takes the following form: "Equity will not act to enjoin a criminal proceeding."

multiplicity of suits situation to arise, *Martin v. Baldy,* supra, at 259, 94 A. at 1093; or, (2) The statute or ordinance in question is unconstitutional and void (either per se or as it applies to the party seeking the injunction), *and* its enforcement will cause the plaintiff irreparable loss to his property. *Duquesne Light Co. v. Upper St. Clair,* 377 Pa. 323, 339-341, 105 A. 2d 287, 294-295 (1954); *Adams v. New Kensington,* 357 Pa. 557, 560-561, 55 A. 2d 392, 394 (1947), and cases cited therein. In such cases the ground of equitable jurisdiction is the protection of property rights. *Ibid.*[3]

B. In the second line of the equity-criminal law cases, the positions of the parties involved is the opposite of the first line. That is to say, in the second line of cases the potential criminal defendant is the one against whom the injunction is sought. It is this series of cases that parallels the instant situation. And these cases are the source of the oft-repeated maxim, noted above, that equity will not act merely to enjoin the commission of a crime.[4] See *Everett v. Harron,* 380 Pa. 123, 128-129, 110 A. 2d 383, 386 (1955); *Diamond v. Diamond,* 372 Pa. 562, 563, 94 A. 2d 569, 570 (1953); *Commonwealth v. Smith,* 266 Pa. 511, 516, 109

---

[3] While exception (1) probably derives from notions originally more pertinent to case line B. wherein a series of prosecutions would become necessary, and exception (2) would seem to historically stem from case line A. considerations, this distinction has never taken root. Both exceptions are applied to both types of cases. See infra, at n. 5.

[4] The probable reason underpinning this "maxim" is that a court order demanding that a man not commit a specific crime *in futuro* would be a fruitless act, since a court of chancery would have no practical method of insuring compliance with its injunction and would thus be assuming an impossible burden. Such a hollow mandate could only bring the processes of the law into disrepute. See *Everett v. Harron,* 380 Pa. 123, at 131, 110 A. 2d 383, at 387 (1955); *Sparhawk v. Union Passenger Ry. Co.,* 54 Pa. 401, 422-423 (1867).

A. 786, 788 (1920) ; *Klein v. Livingston Club*, 177 Pa. 224, 228, 35 A. 606, 607 (1896) ; *Sparhawk v. Union Passenger Ry. Co.*, 54 Pa. 401, 421-422, 423 (1867) ; and *Manderson v. Commercial Bank*, 28 Pa. 379, 381 (1857).

The maxim was given its most accurate formulation in *Everett v. Harron*, supra, *id.* where this Court said, "the mere fact that the act complained of is a crime neither confers equitable jurisdiction nor ousts it . . . . In short, while equity will not enjoin the commission of a crime in order to enforce the criminal law, the criminal nature of an act will not deprive equity of jurisdiction otherwise attaching."

When does equitable jurisdiction "otherwise attach"? It would seem that, in this regard, our courts have tacitly assumed that it makes no difference whether the alleged wrongdoer is the plaintiff or defendant in equity, and have applied the two exceptions outlined, supra, to confer equitable jurisdiction in both lines of cases.[5] Compare *Everett v. Harron*, supra, (multiplici-

---

[5] Exception two, supra, which allows a potential criminal defendant to gain equitable jurisdiction by challenging the constitutionality of the particular statute being wielded against him and alleging irreparable harm, would obviously have no bearing in this latter line of cases insofar as the constitutional challenge facet is concerned, because the potential criminal defendant is here the equitable defendant, i.e., not the party seeking to invoke equity jurisdiction.

However, the second aspect of exception two *would* apply, allowing a party to the criminal action other than the defendant to restrain the allegedly wrongful acts on the allegation of irreparable property harm alone. Thus, when the potential criminal defendant is the equity plaintiff, he must allege more than the ordinary person, in order to gain equity jurisdiction via this exception, i.e., both unconstitutionality *and* irreparable harm.

A person not a party to the criminal proceeding can also restrain such proceeding on a showing of irreparable property injury alone, *Kingsley International Pictures Corp. v. Blanc*, 396 Pa. 448, 153 A. 2d 243 (1959).

ty of suits) and *Manderson v. Commercial Bank,* supra, (property harm) in case line B., with *Martin v. Baldy,* supra, (multiplicity) and *M. & S. Ry. L. Co. v. New Castle,* supra, (property harm) in case line A.

Thus, equitable jurisdiction has attached when an individual equity-plaintiff has shown that the wrong-doer's acts, in addition to violating the criminal law, are also interfering with that individual plaintiff's property rights.[6] See, e.g., *Manderson v. Commercial Bank,* supra; or with that individual plaintiff's personal or civil rights. See *Everett v. Harron,* supra, at 130-133, 110 A. 2d at 387-388;[7] or if a multitude of suits situation is present. *Id.* at 129, 110 A. 2d 386-387.

Further, if the criminal act sought to be enjoined constitutes a "public nuisance" then it may properly be restrained on the motion of the proper public authorities. See *Commonwealth ex rel. v. Soboleski,* 303 Pa. 53, 55, 153 A. 898, 899 (1931) (piggery restrained); *Commonwealth v. Kennedy,* 240 Pa. 214, 87 A. 605 (1913) (stream pollution restrained); cf. *Bunnell's Appeal,* 69 Pa. 59, 62 (1871); and *Sparhawk v. Union Passenger Ry. Co.,* supra, at 424.

---

[6] There is a group of cases holding that the illegal practice of a profession is a proper subject of equitable jurisdiction. Usually, a lawful practitioner seeks to restrain an unlawful practitioner. The rationale allowing the injunction no doubt proceeds on the ground that the lawful practitioner's (or group of practitioners') property rights are being impinged upon by the unlawful practice. See *Boggs v. Werner,* 372 Pa. 312, 317, 94 A. 2d 50, 51-52 (1953) (dentistry); *Palmer v. O'Hara,* 359 Pa. 213, 58 A. 2d 574 (1948) (medicine); *Neill v. Gimbel Bros., Inc.,* 330 Pa. 213, 199 A. 178 (1938) (optometry): cf. *Martin v. Baldy,* supra; *Shortz v. Farrell,* 327 Pa. 81, 193 A. 20 (1937), and *Childs v. Smeltzer,* 315 Pa. 9, 171 A. 883 (1934) (law).

[7] This is the first Pennsylvania case which explicitly holds that equity jurisdiction will lie to enforce one's personal civil rights to the same extent it protects one's property rights. See *Everett v. Harron,* supra, especially at 131, 110 A. 2d at 387.

It is also true that a public nuisance may be enjoined at the behest of a private citizen or group of citizens, if the latter, either in their property or civil rights, are specifically injured by the public nuisance over and above the injury suffered by the public generally. See *Rhymer v. Fretz,* 206 Pa. 230, 55 A. 959 (1903); see also, "Profession" cases, supra, n. 4.

In the instant case, a potential criminal defendant, Bravo, is the equity-defendant. S.P.C.A. asserts that equity jurisdiction attaches on two grounds: (a) because this is a multiplicity of suits situation, i.e., failure to enjoin will mean continuing performances of the Festival, and continuing performances will mean constant criminal litigation and repetitive fining under the pertinent cruelty to animals statute; and, (b) because the Festival constitutes a public nuisance as well as a violation of a criminal statute and, as noted supra, equity has always been possessed of the power to enjoin a public nuisance.

The initial premise that the Festival is a public nuisance is arrived at as follows: The legislature has specifically granted to the court below the power and jurisdiction of a court of chancery relating to "the prevention or restraint of the commission or continuance of acts contrary to law and prejudicial to the interests of the community or the rights of individuals." Act of June 16, 1836, P. L. 784 §13, 17 P.S. §282. A legislative proscription, such as that found in the cruelty to animals statute, is declarative of the public policy and is tantamount to calling the proscribed matter prejudicial to the interests of the public. *Pa. P. U. C. v. Israel,* 356 Pa. 400, 406, 52 A. 2d 317 (1947). Injury to the public is the essence of a public nuisance. Therefore, Bravo's activities are properly enjoinable as being contrary to law and prejudicial to the interests of the public.

S.P.C.A.'s two arguments in this regard are persuasive. We are of the view that the instant situation does indeed fall within those exceptions to the general rule that equity will not enjoin the mere commission of a crime. Because of this, equity can properly exercise its unique jurisdiction to restrain continuing performances of Bravo's Festival.

Bravo finally asserts that even granting the propriety of equitable jurisdiction here, the decree of the chancellor must fall because S.P.C.A. did not have proper standing to bring this equitable action. With this we do agree.

S.P.C.A. notes that it is a nonprofit organization formed for the specific purpose of protecting dumb animals from inhuman treatment and that under §§948 and 949 of the Act of 1939, supra, its agents are expressly given authority to seize any creature which is kept or used for the purpose of fighting or baiting and to arrest any individual violating the law in this respect.[8] It, therefore, maintains that in connection with

---

[8] Section 949 of the Act of June 24, 1939, P. L. 872, 18 P.S. §4949, provides in pertinent part: "Any agent of the Pennsylvania society, or of any society for the prevention of cruelty to animals, shall have power to seize any bull . . . kept, used, or intended to be used for the purpose of fighting or baiting. . . . The agent making such seizure shall make due return to the magistrate before whom the complaint is heard of the number and kind of animals or creatures so seized by him. . . ."

Section 948 of the Act of June 24, 1939, P. L. 872, 18 P.S. §4948, provides: "Any policeman or constable, or any agent of any society or association for the prevention of cruelty to animals duly incorporated under the laws of this Commonwealth, shall, upon his own view of any offense against sections nine hundred and forty-two to nine hundred and forty-seven, inclusive, of this act, make an arrest, and bring before a magistrate the offender found violating said provision, and any policeman or constable, or any agent of any society, as aforesaid, shall also make arrests of such offenders on warrants duly issued according to law, when such offense is not committed in view of said officer, constable or agent."

violations of the law relating to cruelty to animals it is given "arrest and prosecution powers equivalent to those vested in more plenary civil authorities" and thus has the same standing as these authorities to institute an action in equity to prevent such offenses.

The power to arrest and prosecute, however, does not necessarily include the standing or power to sue for injunctive relief. For instance, under §948 of the Act of 1939, supra, a policeman or constable also is specifically given the power to make an arrest for offenses. Would one argue that such constable or policeman has the power and standing S.P.C.A. asserts in this case?

Moreover, it is fundamental that statutes such as those here involved should be strictly construed and should not be enlarged by judicial fiat. It is clear that nothing in the statute involved expressly gives the S.P.C.A. the power or authority to institute this action in equity and we will not read into the statute something that is not written therein.

Nor are we persuaded that the S.P.C.A. either enjoys any greater property right in the prevention of such offenses or suffers injury to any greater degree than the general public when violations of the law relating to cruelty to animals occur. This being so, it has long been established in Pennsylvania that the injunction of such a public nuisance must be sought by the proper public authorities. See *Wishart & Sons Co. v. Erie R. R. Co.*, 283 Pa. 100, 102, 128 A. 730 (1925); *Rhymer v. Fretz*, supra, at 232-233, 55 A. at 960; *Sparhawk v. Union Passenger Ry. Co.*, supra, at 424.

Hence, the decree of the lower court must be reversed since the action was brought by plaintiffs who had no standing to do so, and in allowing S.P.C.A. to act as the sole party plaintiff in this case, the learned court below committed an error of law.

Decree reversed and complaint dismissed. Each party to pay own costs.

CONCURRING OPINION BY MR. JUSTICE COHEN, January 24, 1968:

I concur in the majority's action solely on the ground that plaintiffs lacked standing to institute the complaint.

---

CONCURRING AND DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I agree that there was a violation of the Act and I agree with Justice EAGEN'S Opinion with respect to the applicable law, but I disagree that the S.P.C.A. has no standing.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

If there is one commodity of which there is no need for a further supply, it is violence. If there is one school that the world can afford to miss, it is one for the tutoring of methods of violence, brutality and cruelty. Thus, in Pennsylvania, we can well do without a bullfight which is nothing less than an open air lyceum in the art of torturing helpless animals.

Practically every State in the Union has outlawed bullfighting. Pennsylvania has specifically made bullfighting an offense punishable by fine and, upon repetition of the offense, incarceration. In spite of the clear wording of the Statute of 1939, which prohibits the "fighting or baiting of bulls," Bravo Enterprises, Inc., the defendant in this case, advertised that it would stage in the Philadelphia Arena a series of bullfights beginning April 14, 1966.

The Pennsylvania Society for the Prevention of Cruelty to Animals, plaintiff here, filed a complaint in equity in the Court of Common Pleas of Philadelphia County, asking that the performances be enjoined. The chancellor denied the motion for an ex parte injunction for the first performance (April 14th) so that he

could personally attend the event and thus obtain first-hand knowledge of what the defendant Bravo Enterprises, Inc., intended to present for the entertainment and delectation of the public.

The chancellor set a hearing for the morning of April 15th while the memory of what he would have seen and heard would be fresh in his mind. At that hearing both sides presented evidence as to what occurred.

The record of that hearing as to what happened on April 14, 1966, in Philadelphia cannot help but raise a blush of shame to those who recall the humanity, charity and benevolence which inspired the founder of the City of Brotherly Love. I forego to imagine the expression of astonishment on the face of William Penn had he been present on the night of April 14th, as he would have watched a large box being hauled out into an open arena. The box is torn open, there is a blare of trumpets and a beating of drums, the animal imprisoned within the box tremblingly stumbles out, people yell and then strange bipeds attired in velvet pants and silk stockings brandish red capes before the eyes of the affrighted animal, and when the helpless beast, fearing physical harm, charges in self-defense against his tormentors, the latter plunge metal spikes into his body. That is what is called a bullfight.

There is one principle in the American way of doing things that is universally recognized, invariably defended and constantly eulogized. That is fair play, but where is the fair play in a bullfight? A fight suggests opposing forces somewhat reasonably balanced in might. But in a bullfight the animal has no chance. He is goaded, tantalized and lanced into a state of fury, and then, when the bull, in safeguarding his dignity and, as he has reason to believe, his very life, countercharges, the brave matadors leap behind a fence or wall, and, once the bellowing beast has passed by, they

return to the fray to plunge their pusillanimous prongs into the vitals of a dumb beast who had never done them harm and who, under the laws of nature, is entitled to enjoy the freedom of green fields, refreshing brooks, and playful companionship with other members of the bovine family.

Not only do the matadors wound the bull with spikes and banderillas, not only do they strike him across the nose with blunt swords, but they infuriate him into a mad dash toward a distant wall with which the bull collides head-on traveling at a frenzy of fifty miles per hour, with a resulting headache that no bushel of aspirins could relieve. While all this is happening, a master of ceremonies, through a loud speaker system, urges the audience into stamping of feet and a shouting of "Ole!" No one has described what "ole" is supposed to signify, but the spectators do yell back "Ole!", employing in that vocal outburst about the same degree of intelligence which induced them into disgorging many greenbacks to witness a phenomenon of disgusting brutality which should never have stained the atmosphere of the City of Brotherly Love.

A dog's life is not much of a life of itself, nor is that of a bull, a horse or any other dumb creature. But he is at least entitled to nonmolestation from those who, too gross to understand the rapture of music, too shallow to appreciate the beauty of literature, too sluggish to respond to the drama and comedy of the theater, too apathetic to excite over the wholesome contest of athletics, too dull to comprehend the wizardry of painting and sculpture, must have their superficial natures titillated by the bellowing of pain of a helpless, tripping, bleeding quadruped.

The chancellor who saw the performance concluded that it violated the Act of June 24, 1939, P. L. 872, §942, and entered an injunction against its repetition. The defendant appealed to this Court which has agreed

with the chancellor that Bravo Enterprises, Inc., is engaged in an illegal act which should be enjoined. After affirming the illegality of the Bravo Enterprises enterprises, the Majority of this Court astonishingly concluded that a society specifically formulated for the purpose of preventing cruelty to bulls could not initiate an action to prevent cruelty to bulls.*

The sight of the brave matadors showing their patent leather slipper heels when the enraged bull pursues them is a ludicrous one, but, and I say this with great respect, the decision of this Court to the effect that the Society to Prevent Cruelty to Animals has no standing in court to prevent cruelty to animals is to me an entertaining one. Why, *that* is the very object of the Society to Prevent Cruelty to Animals! Why, that is the very reason it came into being! Who could be better qualified to prevent cruelty to animals, through legal means, than a society created by law to prevent cruelty to animals?

The Society for the Prevention of Cruelty to Animals is not a group loosely joined for an unclearly defined objective. It came into being through a solemn deliberation of the Legislature (Act of April 4, 1868, P. L. 655, §2), which specifically states that: "The objects of the said society are to provide effective means for the prevention of cruelty to animals throughout the state of Pennsylvania, and for the enforcement of all laws or heretofore or hereafter enacted for the protection of dumb animals."

The statute says that the objects of the Society are to "provide effective means for the prevention of cruelty to animals." What means could be more effective than an appeal to the courts to prevent the cruelty the

---

* Although the formal title of the organization is the Society for the Prevention of Cruelty to Animals, the meaning of the title can obviously change with every animal that it seeks to protect.

legislation condemns? *To prevent* means, of course, to make impossible the commission of the evil the statute proscribes. If an ounce of prevention is worth a pound of cure, an injunction to end the shedding of blood is worth a barrel of transfusion.

So determined is the law to prevent cruelty to animals and so resolute was the Legislature that the Society for the Prevention of Cruelty to Animals (S. P. C. A.) was the very organization that could effectively prevent cruelty to animals that the statute, in §949, empowers humane society agents to seize animals which are to be used in violation of §942, which prohibits bull-fighting. Here, again, the law is aimed at making impossible the commission of the intended offense.

Certainly if the S. P. C. A. can seize animals legally, it can come into court and ask the court to enter a decree seizing animals so as to prevent their being subjected to cruelty. Not only is the S. P. C. A. empowered to seize animals, §948 of the Act authorizes the society's agents to make arrests with the same authority vested in policemen and constables to arrest for violation of §942. Thus, the S. P. C. A. enjoys a quasi-official status in connection with the effectuation of the Act of 1939. It is not enough to say, as the Majority Opinion says, that, since police and constables would not have the power asked for by the S. P. C. A., the plaintiff, therefore, did not have that authority. Obviously, constables and police would operate through the district attorney.

But the district attorney has not acted in this case. It would appear that the bellowings of pain of the wounded bull, the shrieks of the frenetic audience which metaphorically could be heard as far away as Montreal, did not reach the ears of the District Attorney of Philadelphia. Or, if they did, he did not consider the enforcement of the law to protect bulls of sufficient gravity to move him into action. Are dumb animals

to be massacred just because the district attorney does not act? It may be, and I say this with deference, that the volume of the district attorney's work will not permit him to patrol the County of Philadelphia seeking out bullfights, dog fights, bear fights, rooster contests, and so on, and to initiate prosecution against the offenders. And it may be that it was for that specific reason that the Legislature placed in the hands of the Society for the Prevention of Cruelty to Animals the authority to make arrests of persons maltreating animals and to seize, for protection, the very animals which are being maltreated.

While ordinarily equitable jurisdiction cannot be resorted to, to prevent the commission of crime, there is the established exception that equity may restrain criminal acts in order to avert multiplicity of litigation for repeated violation of the law. The Majority Opinion admits that this is so. It also admits that bullfighting is a public nuisance and, therefore, enjoinable as such. But, after making these admissions, it sweeps on to a headlong conclusion which somewhat resembles the bull charging the wall, by saying that the Society for the Prevention of Cruelty to Animals does not have standing to sue in equity.

The Majority does not say why this Society created by the Legislature has no standing. It merely says that the statute involved should be strictly construed and that it "will not read into the statute something that is not written therein." The answer to that statement is that the authority of the S. P. C. A. to set in motion the legal machinery to effectuate the purposes of the Society, namely, prevention of cruelty to animals, *is* written in the statute.

But, apart from that, equity jurisdiction does not have to depend on statutory authorization. Indeed, there would be little business in equity if one always had to find the key, which unlocks the chancery gate,

in a statute. Almost invariably it is precisely because there is no statute on a given subject that one goes into equity to ask for relief.

In his adjudication in the court below, the chancellor said that the prolonging of this litigation "proves that a little bull goes a long way." But the bull in this case is not a little one. It weighs 900 pounds, each pound of which shook with the pain inflicted by the courageous, velvet-pants matadors. But the harm done to the public through this Court's refusal to enjoin the degrading spectacle of a gory bullfight in Philadelphia, which is the cradle of liberty of America, is just as lamentable as that done the bull because the decision lends itself to the interpretation that the courts refuse to halt an expedition which exalts violence, heroizes sadists, degrades the world of sports, and lends encouragement to a bloodthirsty importation which violates every concept of American fair play and compassion for helpless creatures.

The Majority Opinion offends against public policy and then, apart from the sociological damage done to society, it commits the cruel fault of confusing the law. The plaintiff does have a standing in the courts. The Legislature gives it standing, precedents give it standing. How can lawyers advise their clients and properly prepare their cases when this Court can so cavalierly ignore established law?

It must be admitted that there are cases where the law is ambiguous and judges differ as to its proper interpretation, there are also cases where the facts are so mixed up that even black-robed Blackstone scholars reach different conclusions as to what they actually are, but here is a case where the law is as transparent as a day in June and the facts as uncomplicated as the silhouette of a village in the rays of a descending sun. Yet, this Court, that is, the majority of it, appraises the law and the facts in a manner which defies logic,

derides common sense and makes one wonder as to what price legal education.

This decision is such an infliction on the profession that I would be happy to be invited to join an organization which could be formulated and entitled Society to Prevent Cruelty to Lawyers.