**Thomas and Carol O'LEARY, et al.**

v.

**MOYER'S LANDFILL, INC., et al.**

**Civ. A. No. 80–3849.**

United States District Court,
E. D. Pennsylvania.

June 9, 1981.

Joseph M. Donley, Robert Hernan, Philadelphia, Pa., for plaintiffs.

Bradford F. Whitman, Jonathan L. Braff, Philadelphia, Pa., for defendants.

## OPINION

LOUIS H. POLLAK, District Judge.

Plaintiffs are several residents and community organizations of Lower Providence Township, Montgomery County, Pennsylvania. Defendants are Moyer's Landfill, Inc., a landfill in Lower Providence Township at which extensive waste-disposal activities have been carried on for many years; and Paul Lanigan and Howard Moyer, Jr., current owners and operators of the landfill. At the outset of the lawsuit, the Pennsylvania Department of Environmental Resources (DER) was also a defendant. The lawsuit, which complains of the assertedly detrimental impact of the waste-disposal activities on the surrounding area, was brought pursuant to (1) the citizen suit provisions of the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act"), and of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.* ("RCRA"); and (2) the Pennsylvania Clean Streams Law, 35 P.S. § 691.1 *et seq.*, the Pennsylvania Solid Waste Management Act, Act of July 7, 1980, Act No. 1980–97, and Pennsylvania's common law of nuisance and negligence.[1]

Specifically, the complaint alleges the landfill's responsibility for: (1) the discharge of leachate, i. e., contaminated liquid, into nearby Skippack Creek; (2) the contamination of water used by the landfill's neighbors for drinking and other purposes; (3) the release of malodors and loose trash; and (4) the illegal inclusion of toxic wastes among the waste materials accepted for disposal.

On December 23, 1980—ruling from the bench—I granted DER's motion to dismiss and denied the motion to dismiss of the other defendants. On February 2, 1981—again ruling from the bench—after consideration of further submissions by the parties on the viability of the allegations under RCRA, I denied the defendants' motion to dismiss that claim. Plaintiffs' requests for preliminary and permanent injunctions against defendants' waste-disposal activities were consolidated, and I thereafter heard some six days of testimony.

The first part of this Opinion recapitulates and summarizes my December 23, 1980 and February 2, 1981 bench rulings. The second and third parts contain my findings of fact and conclusions of law on the application for declaratory and injunctive relief.

### I

Plaintiffs' claims under the Clean Water Act and RCRA were brought under the "citizen suit" provisions contained in each statute. 33 U.S.C. § 1365; 42 U.S.C. § 6972. In general, these provisions authorize the private enforcement of the statutes' requirements by affected persons against alleged pollutors.

In particular, the Clean Water Act allows citizen suits against those who violate an effluent standard or limitation effective under the Act. 33 U.S.C. § 1365(a)(1). One such limitation is section 1311(a)'s proscription of "the discharge [into navigable waters of the United States] of any pollutant by any person," unless authorized under the Act. The landfill has no such authority. The term "discharge of a pollutant" is defined as the addition of pollutants to the navigable waters of the United States from a "point source", 33 U.S.C. § 1362(12), which is in turn defined as

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. . . .

1. The complaint also alleges a violation of plaintiffs' right under Article I, § 27 of the Pennsylvania Constitution, declaring citizen rights to the enjoyment of the environment and the Commonwealth's obligation to conserve and maintain these benefits. This claim has not been pressed by the plaintiffs.

33 U.S.C. § 1362(14). The complaint charges the "discharge" of pollutants from the landfill into the neighboring Skippack Creek.

Plaintiffs' claims under RCRA were brought under both the "hazardous waste" provisions at Subtitle C (Chapter III), 42 U.S.C. §§ 6921–31, and the "solid waste" provisions at Subtitle D (Chapter IV), 42 U.S.C. §§ 6941 *et seq.* The complaint sought declaratory judgment and enforcement of RCRA's requirement that notification be given to EPA of the storage or disposal of hazardous waste, and enforcement of the proscription of "open dumping" of solid waste.

## A. THE FEDERAL WATER POLLUTION CONTROL ("CLEAN WATER") ACT

### 1. *Motions of the Private Defendants*

■ The private defendants—Moyer's, Inc. and its owners—asked that I not take jurisdiction of the case, and instead, under the doctrine of 'primary jurisdiction,' defer to DER and its expertise in the regulation and management of landfills. *Cf. MCI Communications Corp. v. A.T.&T.*, 496 F.2d 214, 220 (3d Cir. 1974). However, the complaint and the plaintiffs' subsequent pleadings show that this suit was brought in part because DER has, in plaintiffs' view, been ineffective in alleviating the dangers plaintiffs perceive at the landfill. Further, the statutory enforcement schemes before me are not so suffused by technical and policy considerations that my exercise of jurisdiction threatens to disrupt DER's exercise of its authority. Nor are the problems central to this litigation beyond the ordinary competence of a court, especially given the helpful participation as witnesses of experts from the relevant agencies.

■ The private defendants also asked to be dismissed on the ground that the complaint inadequately alleged the existence of (1) the pollution's "point sources" and the entry of pollution into "navigable waters," the initial and final locations respectively of the pollution assertedly being discharged

from the landfill. The complaint lists (i) the landfill, (ii) the leachate collection tanks and (iii) the leachate by-pass systems, including leaks from those sources, as "points sources." This is more than sufficient to withstand a motion to dismiss. *See generally, United States v. Earth Sciences, Inc.*, 599 F.2d 368 (10th Cir. 1979), *United States v. Oxford Royal Mushroom Products, Inc.*, 487 F.Supp. 852 (E.D.Pa.1980).

■ Private defendants have also argued that the landfill's position not directly adjacent to the Skippack Creek, nor connected to it by a pipe or tributary, renders a discharge into the Creek impossible. The argument is rejected as frivolous; there is no requirement that the point source need be directly adjacent to the waters it pollutes.

### 2. *Motions of DER*

■ Plaintiffs asserted that DER was directly responsible for any pollution from the landfill as a result of DER's failure to enforce a May 16, 1972 DER Consent Order requiring the landfill's closure should it be found to be discharging. DER's enforcement failure, plaintiffs argued, "contributes directly" to the alleged pollution.

This reasoning finds its genesis in *Montgomery Environmental Coalition v. Fri*, 366 F.Supp. 261, 266–67 (D.C.D.C.1973):

> [T]he proper inquiry should be into whether any of the defendants individually exercises an authority which directly or *indirectly controls the discharge* of pollutants...

*Id.* (emphasis supplied).

In *Fri*, Judge John Lewis Smith was of the view that liability under the Clean Water Act was sufficiently pleaded where the defendant state agencies were alleged to have some "authority over enforcement of water quality standards...," *id.* at 267.

But the Act's grant of citizen suit jurisdiction does not, in my judgment, lend support to a standard so broadly stated. The Act authorizes citizen suits against (1) those alleged to be "in violation" of the Act's limitations, and (2) the Environmental Protection Agency (EPA), through its adminis-

trator, upon the EPA's failure to perform a non-discretionary act. 33 U.S.C. § 1365(a). And it may be noted that Judge Smith, at a later stage of *Fri*, dismissed EPA as a defendant for lack of an allegation of EPA's failure to perform non-discretionary acts. *Montgomery Environmental Coalition v. Fri*, C.A. No. 1307–73 (D.C.D.C. Dec. 12, 1973) *noted at Montgomery Environmental Coalition Citizens Coordinating Committee on Friendship Heights v. Washington Suburban Sanitary Commission*, 607 F.2d 378, 380 n.5 (D.C.Cir.1979). *See also Committee for Consideration of the Jones Falls Sewage System v. Train*, 387 F.Supp. 526, 529–30 n.3 (D.Md.1975).

The ordinary sense of the "in violation" phrase in section 1365(a)(1) connotes defendants who are themselves the instrumentality discharging pollution; the jurisdictional grant does not in terms create responsibility on the part of a regulatory agency charged with the enforcement of standards—even where the agency decides against enforcement.[2] *Cf. United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979) (broad prosecutorial discretion). *But see South Carolina Wildlife Federation v. Alexander*, 457 F.Supp. 118, 132–34 (D.S.C.1978). *Compare* 33 U.S.C. § 1365(h) (suit by state governor to compel EPA to enforce standards). And, were the EPA liable in every case together with a regulated pollutor under section 1365(a)(1), the meaning of section 1365(a)(2) would be eviscerated; for that section authorizes suit against the agency for failure to perform *non*-discretionary acts, a notion that loses most of its substance when all enforcement is mandated. Accordingly, the complaint does not state a cause of action against DER, and DER has been dismissed as a party defendant.[3]

**2.** I have assumed that, for the purposes of construing section 1365(a)(2)'s authorization to sue EPA, DER may be held to stand in the federal agency's place by virtue of DER's role in the enforcement of the statute. *See, e. g.*, 33 U.S.C. § 1319 (state enforcement).

**3.** DER, as an agency of the Commonwealth of Pennsylvania, also argued Eleventh Amend-

## B. THE RESOURCE CONSERVATION AND RECOVERY ACT

The remaining defendants also moved to have the RCRA claims stricken from the complaint. 42 U.S.C. § 6901 *et seq.*[4]

### 1. *RCRA: Open Dumping Prohibition*

Section 6972 provides the jurisdictional basis for citizen suits:

> Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—
>
> > (1) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter . . . .

42 U.S.C. § 6972(a)(1).

The question before me is whether the complaint properly alleges a "violation of any permit, standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter." Plaintiffs' claim that they have alleged such a violation rests upon the extended allegations in the complaint that activities of defendants have resulted in what is called "open dumping" of "solid waste" within the meaning of the relevant provisions of RCRA, most particularly subtitle D (subchapter IV) of that statute at 42 U.S.C. 6941 *et seq.* In particular, plaintiffs rely on 42 U.S.C. § 6945, most especially subsection (c) of that section as it stood up through October 21, 1980.

■ As of the date the complaint was filed, October 3, 1980, § 6945(c) said in part:

ment immunity from this suit. It has not been necessary to reach this issue in view of my disposition of the statutory arguments.

**4.** The following discussion of RCRA is a modestly edited version of my Bench Opinion delivered February 2, 1981.

Any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance established under this section.

Now, the position of plaintiffs, simply stated, is that the sentence declaring a prohibition is an "order" or "requirement" within the meaning of the quoted citizen suit provision. 42 U.S.C. § 6972(a)(1).

The position of defendants is that the "except" clause—that is, "prohibited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance established under this section"—means that a prohibition is put into force by the statute only *after* a "timetable or schedule for compliance" has been promulgated.

The reference to a "timetable or schedule for compliance" is a reference to plans which the statute anticipates each state will establish for the regulation, which is to say either "closing" or "upgrading" of open dumps.

The statute as a whole does contemplate that states will formulate plans which will identify their open dumps and set out schedules for the elimination or the amelioration of such dumps over a time period which the statute specifies as not exceeding five years.

█ It is plain that subsection (c) of § 6945 does contemplate that it will be a proper defense to a citizen suit that an open dump is conforming to whatever requirements are laid down in a state plan for elimination or amelioration of the conditions which, but for such state plan, would, as to that open dump, constitute a prohibited form of disposal.

The essence of the defendants' argument is that the citizen suit provision becomes a device for private persons to monitor compliance with a state plan as it relates to a particular open dump after the state plan has set forth a schedule with which the open dump is to comply.

The plaintiffs' position is that the prohibitory language does not wait to take effect until the promulgation of a state plan, but, instead, took effect as enacted,[5] and that the operation of a state plan simply presents a framework, compliance with which would then become a matter of defense for an enterprise that would otherwise be vulnerable to suit under the citizen suit provision.

Defendants reply that plaintiffs' construction of the statute results in a statutory absurdity. Defendants see the statute as depending very heavily on state initiatives and quite clearly erecting a procedure under which conformity with state initiatives would offer protection against a citizen-suit in federal court. That being so, defendants say, it is hard to imagine that Congress could have contemplated that there would be citizen suits in advance of the state procedures coming into play.

█ Certainly, Congress contemplated that states would carry the main burden of regulation. On the other hand, the statute does not *compel* states to enter this regulatory field: defendants' interpretation of paragraph (c) of § 6945 accordingly carries with it the implication that if a state did *not* promulgate an appropriate plan, including compliance schedules to which open dumps were to conform, the prohibitory language in the first sentence of paragraph (c) would simply not come into effect at all. But though Congress might have so legislated, it is hard to see why we should read Congress as having so legislated unless the language it chose quite clearly signaled such an interpretation.[6] Instead, I take

5. This is subject, as I note below, to the amendatory language of October 1980.

6. It can be argued that with respect to this statute it is particularly hazardous to couch analysis in terms of what language Congress

"chose," in view of the fact that the statute as finally enacted was a compromise version which went through both chambers with little opportunity for deliberation. It is reported that House action followed so quickly after all-night drafting of the compromise that "no member of

Congress to mean what the statutory language says, not less and not more: that there is a prohibition, but the prohibition is obviated under the circumstance of a showing of compliance with a state plan.[7]

The construction I put on the statute is consistent with what I understand to be the view of the Environmental Protection Agency, which has the principal authority for the implementation of RCRA:[8]

> The open dumping prohibition is a provision of Federal law which stands on its own, separate from the State planning program. In conjunction with the citizen suit provision, the open dumping prohibition creates a Federal cause of action allowing citizens and States to seek relief in Federal Court for damaging solid waste management practices.

44 Fed.Reg. 45066, 45072 (1979).

■ Although the amendatory language, which took effect when approved on October 21, 1980 governs this aspect of this lawsuit, it does not change my construction of the statute.

The statute now reads:

> (a) Upon promulgation of criteria under section 1008(a)(3) [42 U.S.C. § 6907], any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohib-

ited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance established under this section.[9]

The effect of the amendatory language read in its ordinary terms is to specify a point in the calendar at which the statute now says a solid waste management practice or disposal is prohibited. That point in the calendar is the promulgation by the federal authorities of criteria establishing the context for state plans to the extent that states undertake to enter this field. Those criteria were promulgated on September 13, 1979. 40 C.F.R. § 257; 44 Fed. Reg. 53460. And thus the amendatory language makes it even clearer that the prohibition relied upon by plaintiffs is already in effect.[10] Accordingly, the motion to dismiss directed to that claim for relief is denied.

## 2. RCRA: Hazardous Waste Prohibition

Plaintiffs view their complaint as adequately charging defendants with violation of not only the solid waste prohibitions but the hazardous waste prohibitions of the statute. As to the hazardous waste aspect of the allegation, defendants take the position (a) that they were not given the sixty days notice which the statute requires, and (b) that they effectively haven't been given any notice at all—and certainly not in the complaint—that there is a hazardous waste

---

the House could have read" the version the House adopted. W. Kovacs & J. Klucsik, *The New Federal Role in Solid Waste Management: The Resource Conservation and Recovery Act of 1976*, 3 Colum.J.Envir.L. 205, 220 n.77 (1976). But absent a compelling demonstration of statutory ambiguity, a court is duty-bound to determine what Congress has decided on the basis of what Congress has enacted.

7. The Commonwealth of Pennsylvania has not yet put such a plan into effect; thus, no appropriate compliance schedules have issued.

8. The agency's view of what its statute means is not controlling, but it is entitled to great weight. *See generally, Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1960).

9. Added language emphasized. Previous subsection (a) was deleted and this section interposed.

10. Brief legislative history is found in 10B U.S. Code Cong. & Admin.News (96th Cong.2d Sess. 1980). The Senate bill, which became in due course the conference substitute adopted by the full Congress, is described as:

> deleting subsection (a) in its entirety and ... making the open dumping prohibition of subsection (a) as redesignated effective upon the promulgation of the criteria under Section 1008(a)(3) and measure the five-year limit on compliance schedules from the date of such promulgation.

*Cf.* R. Andersen, *The Resource Conservation and Recovery Act of 1976: Closing the Gap*, 1978 Wisconsin L.Rev. 633, 670. Contrast my construction of the effective date of the prohibition with Kovacs & Klucsik, supra, n.6, 3 Colum.J.Envir.L. at 235–36 and n.132 (written before new amendments).

allegation. 42 U.S.C. § 6972(c), *as amended* Nov. 8, 1978.

█ The first question is whether the complaint fairly put the defendants on notice that the plaintiffs were really making allegations about "hazardous waste"[11] as distinct from "solid waste."[12] It is true, as plaintiffs observe, that the statute refers to "hazardous waste" as one form of "solid waste";[13] nonetheless, the broad architecture of the statute does distinguish between these two concepts.[14] Although the words "hazardous wastes" appear in paragraphs of the complaint,[15] I do not find that "hazardous waste," to the extent that it is a concept distinct from "solid waste," was really brought to the defendants' attention by the complaint. Instead, the focus of the RCRA claim is clearly the allegation that the landfill is an "open dump" (as opposed to a "sanitary landfill") in which *solid*, not hazardous, wastes are being treated. Accordingly, I find the complaint itself is inadequate notice of "hazardous waste" allegations.

On December 8, 1980, plaintiffs filed a supplementary memorandum of law on the applicability of RCRA, developing at very considerable length their contention that the complaint deals with "hazardous waste" in the sense contemplated by RCRA.

Though the complaint itself has never been amended or reformed, it is my view that, from December 8 on, defendants have known that this set of claims was, in plaintiffs' perception, in this case; accordingly, we now have a complaint which can be said to have been construed by the pleaders as of December 8, 1980 to cover hazardous wastes as well as solid wastes. The sixty day notice provisions of 42 U.S.C. § 6972(b)(1) should be construed to require the giving of effective notice before a party is called upon to defend an action or comply with a consequent court order; the notice provisions should not be treated as steps in some elaborate procedural minuet requiring the refiling of the complaint.[16] Accordingly, section 6972's requirements were met,[17] and the pleadings are sufficient to permit the litigation of the claim.

## II

The landfill is in Lower Providence Township, Montgomery County, Pennsylvania, and consists of fifty-five acres. It operates under Commonwealth State Solid Waste and Water Quality Permits, which require 5.5 of the acres to be lined before accepting trash. Between two and three of the acres are lined, and constitute the area of active filling; the balance of the site, separated by an interceptor curb, consists of trash and its covering material laid down in the more than ten years of the landfill's operations. Roughly 2.3 acres is currently available for further filling, upon creation of the appropriate lining.

Flowing to the northwest of the landfill—at distances ranging from three hundred to thirteen hundred feet—is Skippack Creek, a navigable stream. Between the Skippack and part of the landfill is an asphalt-lined interceptor trench, designed to intercept leachate[18] which would otherwise

---

11. Subtitle C, or Chapter III, of the statute. 42 U.S.C. §§ 6921–31.

12. Subtitle D, or Chapter IV. 42 U.S.C. § 6941 *et seq.*

13. *See, e. g.*, section 6945(a) as it is now written.

14. Compare the definitions at sections 6903(5) and 6903(27).

15. See ¶¶ 39.2, 22(p), 23.

16. *See Pymatuning Water Shed Citizens for a Hygienic Environment v. Eaton*, slip op. at 4 (3d Cir. March 30, 1981) (per curiam) (sixty-

day notice provision under Federal Water Pollution Control Act, 33 U.S.C. § 1365).

17. The expiration of § 6972's time requirements would have come sixty days from December 8, 1980; given my rulings in the text (to which defendants continue to take exception) defendants agreed to waive the very few days between that expiration and the first day of RCRA hearings.

18. Leachate is the liquid, originally rain or groundwater, which has passed through the landfill mass, and therefore contains soluble and miscible materials from that mass.

be discharged into the Skippack. Collection tanks and basins have been built to receive leachate from the interceptor trench, the liner underneath the active fill, certain ground seeps, and a ditch at the southern end of the fill; pumps convey the leachate up the slope of the fill to a storage tank. From the top of the fill, the leachate is recirculated down into the body of the landfill mass, a technique meant to reduce both the strength and the volume of leachate through its absorption by the trash. By agreement reached with DER in October of 1976, the landfill was expected to transport some 50,000 gallons of leachate per month to the Borough of Bridgeport sewage treatment plant; this was an integral part of the system approved to contain leachate discharge at the landfill. A June 1977 letter to EPA from a landfill representative stating that leachate was being hauled, was in error: up to 1980 leachate was not hauled from the fill on any regular basis. Instead, recirculation, which cannot permanently dispose of leachate, was in general the only manner in which leachate was treated. Although the landfill's treatment system has no permit to discharge leachate, nor is designed to discharge leachate, an amount estimated on the order of 100,000 to 200,000 gallons of leachate, out of roughly two million gallons generated, escapes the system each year.

Liquids that either appeared to be leachate—colored dark yellow or brown, with an offensive odor—or were shown to be leachate by laboratory tests, have escaped the recirculation system. These discharges generally fall into one of two categories. The first results from "ponding" and overflowing collection tanks. Ponds of rainwater, formed by the inadequate grading and covering of the landfill's surface, mix with surface leachate and at times overflow beyond the landfill's boundaries. Broken collection tanks, or those with malfunctioning pumps, also result in overflows. These overflows either seep back into the landfill mass or, if voluminous as a result of heavy rainfall, escape the property altogether.

The second sort of discharge, which often results from the absorption of the first, is the groundseep. In these cases, leachate oozes from the landfill's slopes and, unless either reabsorbed or caught by a collection basin, escapes the property.

When leachate escapes the boundaries of the landfill, the frequent result is the contamination of the Skippack—a result dictated by the land contours adjacent to the landfill. On the northwestern side, the landfill borders on state park land which slopes at grades varying from medium to steep down to the Skippack. To the northeast, the land adjacent to the landfill slopes down to a stream running down a natural swale; and to the south, below the landfill, runs Eagle Stream. Both streams feed into the Skippack. Groundwater in the area flows in a westerly and northwesterly direction, towards the Skippack and the northeast swale, except at the south and southeast sides of the landfill, where the swale directs the groundwater to Eagle Stream.

The landfill has often been cited for the discharge of leachate and inadequate covering of trash. The leachate-bypass problem is "periodic and has continued" over the years up to the time of the hearings, DER's Regional Solid Waste Manager for the region testified. On April 21, 1978, EPA notified the landfill of its belief that leachate was being discharged into the Skippack. On August 10, 1978, DER notified the landfill's operators that they were permitting the discharge of leachate into a tributary of the Skippack. On September 14, 1978, the landfill was cited for violation of a series of DER regulations, including failure to provide daily cover, and failure to comply with the landfill's groundwater monitoring program. On July 10, 1980, DER notified the landfill that leachate was being discharged and that daily cover was not being provided. DER directed the landfill's operators to develop and submit for approval a permanent and completely effective leachate collection system. On August 12, 1980, DER was again told to submit plans for a leach-

ate collection system.[19] Up to the time of the hearings, no plans for a collection system had been submitted to DER, nor had construction commenced.

On the 26th and 27th of January, 1981, a DER representative noted (1) an overflowing earthen pond on the southern side of the fill, discharging liquid past the southern collection tank and toward Eagle Stream, and (2) leachate "bubbling right out of the ground" at a crack in a collection tank on the northwest corner of the landfill, flowing towards the Skippack.

On January 29, 1981, DER issued an Order of License Suspension, closing the landfill from February 2 to 6:00 A.M. on February 9, 1981. The agency cited, among other violations, (a) the lack of daily cover, (b) filling on unlined areas, and (c) leachate discharges from the fill into the Skippack.[20] On February 9, 1981, one of the plaintiffs in this case visited the site and saw what appeared to be frozen leachate surrounding a collection basin on the westerly side of the landfill; the bright yellow and white ice extended from the top of the landfill, past the collection basins, down a gully and into the Skippack. The visit also revealed liquids seeping out from underneath collection basins and into the Skippack. These seepages were described as dark brown, with a "toxic smell," and flowing steadily.

Moyer's Landfill has also been the subject of sampling expeditions conducted by EPA, DER, and analysts retained by the landfill's operators, often done concurrently with the visual inspections described above.

On January 9, 1980, EPA representatives sampled leachate found in collection basins, and in one instance found flowing past a collection basin, on the northern and southern ends of the fill. This leachate, not traced to a discharge into the Skippack, contained known carcinogens, including vinyl chloride (0.3 ppb [parts per billion]; 7 ppb; 1 ppb); 1, 1-dichloroethylene (2 ppb; 1 ppb); trichloroethylene (20 ppb; 9 ppb); benezene (2 ppb; 4 ppb; 3 ppb; 2 ppb); tetrachloroethylene (trace; 0.5 ppb); 1, 2-dichloroethane (3 ppb; 0.6 ppb).[21]

DER took samples at the landfill on April 3, 1980. Ponding liquid on the fill contained levels of ammonia and BOD[22] above that for normal background water, showing it to be leachate. Similar results were obtained for liquids seeping into a tributary of the Skippack, bypassing leachate collection tanks. One of the discharges had broken through a channelling dirt berm; another was made up of liquids, channeled by three trenches, which bypassed a collection tank and eventually emptied into the Skippack.

EPA conducted further samplings on May 6, 1980. Four samples contained carcinogens: 1, 4 dioxane (at each of three locations, between 1 and 10 ppb), and tetrachloroethylene (2 ppb). One sample containing 1, 4 dioxane was obtained from a leachate stream from the landfill discharging into the Skippack. Two other of the described samples were obtained from leachate bypassing a collection tank. With respect to the other samples collected on May 6, 1980,

---

**19.** In April, May, June, July, September, and November 1980, various plaintiffs observed seepages from the landfill bypassing collection tanks and oozing from underneath seep collectors and running down both the westerly and southerly slopes into the Skippack.

**20.** Apparently, it was the intention of DER that the suspension not automatically terminate on February 9, but rather that certain remedial actions be taken before operations resumed. The DER order of January 31 was, however, somewhat opaque.

**21.** "Suspected" carcinogens found at the landfill on January 9, 1980 included isopropyl benezene; 1, 1-dichloroethane; chloroethane;

methylene chloride; trans-1, 2-dichloroethylene; cis-1, 2-dichloroethylene. See note 39, *infra*.

**22.** Biochemical oxygen demand levels increase in proportion to organic levels in the liquid, in turn substantial evidence that the liquid sampled has been exposed to deposited trash in the fill. Also evidentiary of the fill's leachate are the presences of nitrates, COD [chemical oxygen demand], chlorides, heavy metals, unusual turbidity, as well as the carcinogens described in the text. The findings below that leachate was present at a certain location are based upon laboratory results showing the presence of some of these indicia.

plaintiffs have failed satisfactorily to correlate visual reports of all asserted channeling with the various chemical analyses. Accordingly, I find the source of the latter samples of leachate to be generalized seepage from the landfill.

DER conducted additional samplings on May 12, 1980. These included one taken from a flow moving from a collection pit on the westerly side into the Skippack. This sample was leachate, and contained an extraordinary amount of lead (139,650 micrograms per liter), and chromium (3,650 micrograms per liter).[23] Leachate was also found flowing past two collection pits into the Skippack, and in a shallow depression between two collection pits.

A private hydrologist obtained four samples at the landfill on November 26, 1980. All were of leachate[24] discharging into Skippack Creek, directly or by way of the Eagle Stream. The source of the first sample was a stream of leachate bypassing a collection basin at the southerly swale; the second sample was taken from a channel on the western corner of the fill; the third came from a broad seep area on the western slope of the landfill; the fourth sample was taken from a roadside ditch containing a flow which led into the westerly swale and thence the Skippack.

No conclusive evidence was presented to me with respect to the impact on Skippack Creek of these discharges. The Skippack is a fast-flowing creek and the comparisons of samples taken up-stream and down-stream from the landfill do not reveal measurable harm to the water. A number of witnesses expressed concern that various heavy metals and carcinogens were entering the Skippack, but were unable to say more than, for example, a "potential exists for an adverse impact" on the Skippack and the life it supports.[25]

Nevertheless, it is clear that the landfill and its operators have discharged pollutants into the Skippack, and have been cited by DER for doing so. Generally, the response of the landfill operators has been to undertake some corrective action; but, since 1978, their corrections have been of a temporary, stop-gap nature, such as the creation of earthen berms and consequent collection ponds.[26] The landfill simply has not yet complied with DER's directives to propose and then construct an acceptable, permanent, effective leachate collection system.

## III

### A. THE FEDERAL CLEAN WATER ACT

This Act prohibits the unlicensed discharge of any pollutant. 33 U.S.C. § 1311(a). The definitions at 33 U.S.C. § 1362 explain the prohibition as directed towards the addition of pollutants[27] to waters of the United States from a "point source." See *supra* at 3. The only dispute here is whether the discharges described above were from point sources, for it is beyond cavil that the landfill has, without a

23. Hexavalent chromium is a carcinogen, and poses an unacceptable risk above 50 micrograms per liter. 25 Pa.Code § 93.7 (Pennsylvania Water Quality Standards). Although the figure given in the text includes trivalent chromium, I am satisfied from expert testimony that, given the total chromium, the 50 microgram level for the hexavalent state was exceeded. The figures given here for chromium have no direct legal effect, as the criteria published at 25 Pa.Code are for ambient stream conditions, and not the discharge.

24. This includes groundwater containing leachate.

25. Moyer's Landfill paid $10,000 to the Clean Water Fund, 35 P.S. § 691.8, as a result of a DER July 3, 1980 sampling of the Eagle Stream. Fish were killed, assertedly as a result of the landfill's discharge. This represents the only direct evidence of damage to the Skippack Creek. The problem of an "acceptable" risk, presented by the witnesses referred to in the text, is discussed briefly below in the context of the common law nuisance claims.

26. There was some testimony that a large french drain near the southerly swale and a drainage ditch on the easterly slope had been built at an unspecified time. It is not clear that the drain still exists.

27. "[T]he man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19).

permit, 33 U.S.C. § 1342, discharged pollutants in United States waters.

The essence of a point source discharge is that it be from a "discernible, confined, and discrete conveyance." 33 U.S.C. § 1362(14). Contrary to defendants' assertions, this has nothing to do with the intent of the operators or the reasonableness of the existing collection system. *See generally Sierra Club v. Abston Construction Co.*, 620 F.2d 41, 45–46 (5th Cir. 1980). Notwithstanding that it may result from such natural phenomena as rainfall and gravity, the surface run-off of contaminated waters, once channeled or collected, constitutes discharge by a point source. *Sierra Club*, 620 F.2d at 47. When a leachate collection system

> fails because of flaws in the construction or inadequate size to handle the fluids utilized, with resulting discharge, whether from a fissure in the dirt berm or overflow of a wall, the escape of liquid from the confined system is from a point source.

*United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir. 1979). The discharges here from, *inter alia*, (1) overflowing ponds, (2) collection-tank bypasses, (3) collection-tank cracks and defects, (4) gullies, trenches, and ditches, (5) broken dirt berms, all constitute point source discharges. *See United States v. Oxford Royal Mushroom Products*, 487 F.Supp. 852, 854 (E.D.Pa.1980). Accordingly, I find the landfill and its operators in violation of the Clean Water Act. Moreover, given the present condition of the landfill's collection system, it is overwhelmingly probable that such discharges will continue to occur in the future, especially after rainfall.

## B. THE RESOURCE CONSERVATION AND RECOVERY ACT

The landfill's liability under RCRA depends on whether disposal practices constitute "open dumping" under 42 U.S.C. § 6945(a), *as amended* October 21, 1980.[28] The relevant criteria are published at 44 Fed.Reg. 53461 (September 13, 1979), 40 C.F.R. § 257.1, and define an "open dump" as a facility that does not comply with the requirements there set forth. 40 C.F.R. § 257.2.

My determination of point source pollution also leads to a finding that RCRA has been violated. 40 C.F.R. § 257.3–3(a). However, the evidence of non-point source discharges[29] does not support plaintiffs' allegation of a RCRA violation under 40 C.F.R. § 257.3–3(c), as no evidence of a "Section 208" plan, which would provide the relevant standards, was introduced.[30]

Further, plaintiffs failed to establish a violation of 40 C.F.R. § 257.3–4's prohibition on the contamination of an underground drinking water source. Contamination is defined at § 257.3–4(c)(2) as elevations of concentrations above set "maximum contaminant level[s]." Those levels were not shown to have been exceeded. *See* Appendix I, following 40 C.F.R. § 257.4. Indeed, the groundwater in the area (1) flows away from the sampled wells to the northeast of the fill, and (2) was not shown to travel past or under the Skippack to sampled wells on its far side.

Finally, plaintiffs have not established a violation of 40 C.F.R. § 257.3–6(a), which requires the "periodic application of cover material or other techniques as appropriate so as to protect public health." It is certainly true that the landfill has failed to place sufficient *daily* cover on occasions, as required by DER, but the federal regulation requires only sufficient application to "minimize" the "on-site population of disease vectors," that is, disease transmission by

---

**28.** As the first portion of this opinion notes, the prohibition was in effect before this date under a different subsection.

**29.** For example, the broad, generalized, and uncollected ground seeps noted on November 26, 1980 from which the third sample was taken.

**30.** Section 208 plans are developed under 33 U.S.C. § 1288 to improve designated areas that have substantial water quality control problems. See generally 44 Fed.Reg. 53438, 53444–45 (Sept. 13, 1979).

birds, wind, and the like. No evidence correlated the cover conditions at the fill with any risk estimate of disease vectors, and accordingly, I find no violation of this requirement of RCRA.

The hazardous waste provisions of RCRA require any operator of a site for the storage or disposal of hazardous waste to give notice of the activity to EPA or the state before undertaking the activity.[31] Hazardous wastes are listed at 40 C.F.R. § 261.30 *et seq.*, 45 Fed.Reg. 33084, 33122 (May 19, 1980), and include the carcinogens found to be escaping in the landfill's leachate, see *supra* at 653. 40 C.F.R. § 261.33(f) (toxic wastes).

Defendants argue that the landfill does not store or dispose "hazardous" waste because that term includes relevant wastes EPA has listed only if they are "discarded or intended to be discarded." 40 C.F.R. § 261.33; see also 45 Fed.Reg. 78532, 78540 (Nov. 25, 1980). The evidence, defendants suggest, showed only that the listed toxic chemicals were found in the landfill's leachate, not that they were "discarded" at the landfill.

■ A hazardous waste does not lose that description because it is mixed with some other waste, or is found in leachate, 40 C.F.R. § 261.3(a)(2)(ii); 45 Fed.Reg. at 78540; indeed, leachate from hazardous waste is an important target of RCRA. 43 Fed.Reg. 58946, 58952 (Dec. 18, 1978). And the regulatory definition of a "discarded" waste, which in turn includes materials "disposed of," 40 C.F.R. § 261.2(c)(1), points directly to contaminated leachate:

> A material is "disposed of" if it is discharged, deposited, injected, dumped, spilled, leaked or placed into or on any land or water so that such materials or any constituent thereof may enter the environment or be emitted into the air or *discharged into ground or surface waters.*

40 C.F.R. § 261.2(d) (emphasis supplied); see also 40 C.F.R. § 260.10(a)(14). The evidence adduced of § 261.33 toxic chemicals in leachate from Moyer's Landfill is compelling evidence that those chemicals were "discarded" at the landfill.

■ However, defendants accurately note that § 261.33 chemicals, even if discarded, are not "hazardous" unless the chemicals were "commercial chemical product" or "off specification" commercial product. *Id.* These categories encompass the

> commercially pure grade of the chemical, any technical grades of the chemical that are produced or marketed, and all formulations in which the chemical is the sole active ingredient.

45 Fed.Reg. 78541 (Nov. 25, 1981) (amending 40 C.F.R. § 261.33).

It is fairly clear from EPA's comments to the regulations that the limitation to commercial product was meant to exclude materials that simply contained such a chemical, but which were not themselves the product. When EPA first proposed a chemicals list, it did so by limiting the proposed regulations to those "normally shipped" under the listed name, 43 Fed.Reg. 58946, 58957–58 (Dec. 18, 1978).[32] When carcinogens were added to the proposed hazardous waste list, they too were included only if they "would be shipped using a name listed," 44 Fed.Reg. 49402 (August 22, 1979). As EPA promulgated rules in "interim final form"—as opposed to "final final regulations"[33]—it commented:

> The decision to regulate hazardous waste use and recycling necessitates the development of a working definition of "waste" which can appropriately distinguish between "wastes" and other materials (such as products and chemical intermediates) for purposes of determining whether their use is subject to RCRA's jurisdiction.

45 Fed.Reg. at 33093.

> The regulation was intended to designate chemicals themselves as hazardous

---

31. 42 U.S.C. § 6921 *et seq.*; § 6930(a), *as amended* October 21, 1980. This section prior to amendment included essentially the same requirement.

32. Spill clean-up residues, debris from spills, and off-specification products were included, then as now. *Id.* See, e. g., 45 Fed.Reg. 33116 (May 19, 1980).

33. 45 Fed.Reg. 33084, 33088 (May 19, 1980).

wastes, if discarded, not to list all wastes which might contain these chemical constituents.

45 Fed.Reg. at 33115. Final regulations were accompanied by similar comments. 45 Fed.Reg. 78532, 78540, 78541 (Nov. 25, 1980):

> EPA intends that the materials listed in § 261.33 include only those commercial chemical products and manufacturing chemical intermediates that are known by the generic name [listed].

It is likely that the agency so circumscribed its hazardous chemicals list, at least in part, in an effort to allow effective enforcement of RCRA's prohibitions: As written, the regulations allow immediate identification of listed chemicals by their manufacturers or other generators. See 45 Fed. Reg. at 33105–06. The criteria proposed in 1978, referring to the name under which the chemicals were to be shipped, similarly allowed such identification. In any event, EPA's limitation of listed hazardous wastes to those disposed of in a commercially identifiable form has been consistent, relatively unambiguous, and not challenged here.

Plaintiffs adduced no evidence that the discarded toxic chemicals were materials disposed of in their commercial form, rather than, for example, materials which were the residue of other waste. Accordingly, I cannot conclude that the landfill is a non-complying hazardous waste site.

### C. THE STATE LAW CLAIMS

■ Plaintiffs have also brought suit under the Pennsylvania Clean Streams Act, 35 P.S. § 691.1 et seq., and the Pennsylvania Solid Waste Management Act. Act of July 7, 1980, Act No. 1980–97, 1980 Pa.Legis. Serv. 362 et seq.

The findings underlying my conclusion that pollutants have been discharged into the waters of the United States under the Clean Water Act also lead me to conclude that pollutants have been discharged into Commonwealth waters, which include "any and all rivers, streams, creeks ..." within this state. 35 P.S. § 691.1. Accordingly, I find the defendants have violated the Pennsylvania Clean Streams Act. 35 P.S. § 691.-401.[34]

Plaintiffs have advanced other claims under the state statutes, which declare a violation of their provisions to be a "public nuisance," 35 P.S. § 6018.601, 1980 Pa.Legis. Serv. 362, 383 (Solid Waste Management Act); and a "nuisance," see e. g., 35 P.S. § 691.202 (Clean Streams Act) (sewage discharge), 691.307 (industrial waste discharge), 691.401 (prohibition of all pollution). Section 691.601(a) states that nuisances so declared "shall be abatable in the manner provided by law or equity for the abatement of public nuisances."[35]

■ Public nuisances may be civilly prosecuted by private plaintiffs only if these plaintiffs allege and prove specific injury "over and above the injury suffered by the public generally." *Pennsylvania Society for the Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*, 428 Pa. 350, 237 A.2d 342, 348 (1968).[36] In the alternative, public nuisances are abated by public authorities, *id.*, 237 A.2d at 349.

■ A private nuisance may be abated when the plaintiff's use and enjoyment of his land are substantially diminished by the defendant. *Folmar v. Elliot Coal Mining Co.*, 441 Pa. 592, 272 A.2d 910, 912 (1971) (adopting Restatement of Torts § 822 (1939)).

**34.** Plaintiffs have standing here under the statute's citizen suit provision, 35 P.S. § 691.601(c), *as amended*, Act 157, October 10, 1980, 1980 Pa.Legis.Serv. 803, 818. While the Solid Waste Management Act allows citizens to intervene in suits brought by DER, 35 P.S. § 6018.615, 1980 Pa.Legis.Serv. 362, 389, no provision analogous to the Clean Streams Act's citizen suit provision appears.

**35.** "[C]orruption of waterways has long been recognized as both a public and private nuisance" at common law. *Commonwealth ex rel. Shumaker v. New York & Pennsylvania Co.*, 367 Pa. 40, 79 A.2d 439, 444 (1951).

**36.** *Compare* Restatement (Second) of Torts § 821C (1979) (plaintiff must have suffered a harm of different *kind* from that suffered generally).

While plaintiffs have urged findings of both public and private nuisance, the record fails to support those findings. There is insufficient evidence showing significant contamination of plaintiffs' drinking water, and there is virtually no evidence showing that the existing contamination of drinking water is a result of the landfill operations. The Skippack itself is a healthy creek, and, as discussed above, there is little evidence of harm to its ecosystem. The reported incidents [37] of blowing litter, dust,[38] and odor were too sporadic, and insufficiently significant to call for a court's intervention. *Compare* Restatement (Second) of Torts § 821F & comment *c* (1979).

Plaintiffs' failure to make out the nuisance claims is no indication of the potential hazards posed by the landfill. Witnesses expert in water and solid waste management and toxicology noted the risks posed by leachate containing known and suspected [39] carcinogens. The results of chemical analyses, however, taken as most were from leachate and not the waters of the Skippack, do not allow a confident assessment of the risks presented by the leachate's discharge, or, in turn, injuries, if any, which may befall those using the Skippack. In short, the harm caused by the landfill's discharges, toxic and otherwise, is not proved and not known. These failures of proof are fatal to the common law negligence and nuisance allegations of the present complaint.[40] To the extent those claims rely on leachate discharges, plaintiffs were unable to show either (1) injury to their property, or, a *fortiori*, (b) specific injury "over and above" that suffered by others. Accordingly, the private and public nuisance claims are dismissed. And because actual injury as a legal consequence of the landfill's operations was not shown, the common law negligence claim is also dismissed.

## D. REMEDIES

I have concluded that defendants are in violation of the Clean Water Act and the Resource Conservation and Recovery Act. In their prayer for relief, plaintiffs ask, among other things, that I order the landfill closed. This, however, would be an inappropriate remedy. Closing the landfill is unlikely of itself to stop leachate discharge; indeed, the addition of more trash may absorb and weaken excess leachate. Accordingly, the defendants will not be directed to close the landfill, but they will be directed to take those steps which will lead, at the earliest possible date, to the complete and permanent containment of leachate generated by the landfill.

The accompanying Order (1) declares the defendants to be in violation of the Clean Water Act and the Resource Conservation and Recovery Act; (2) directs defendants forthwith to repair all damaged elements of the existing leachate collection system; and (3) directs the parties, after consultation

---

**37.** Only two plaintiffs testified. Richard T. Brown currently lives about 2,500 feet northeast of the fill, and presented no evidence that he was especially injured by the landfill. Thomas O'Leary testified that blowing litter came on his property from the fill; the sum of the evidence of substantiality was his testimony that he still experienced "problems" with litter.

**38.** The dust appears to be the result of the access roads' conditions—roads not owned by Moyer's Landfill, Inc.

**39.** Suspected carcinogens are those shown to be carcinogens in animals or whose chemical composition relates them to known carcinogens.

**40.** It may be that these problems of proof, to the extent typical of environmental cases, contributed to Congress' motives in passing statutes such as RCRA and the Clean Water Act. Certainly, the sort of injuries redressed under the statutes are not limited to those affecting a landowner's enjoyment of his property, as is the general requirement for a common law nuisance claim. The different interests controlling land use have often been manifested by the reciprocal, sometimes synergistic, and frequently contrasting, relation of statute and common law. In this country, private landowners and the felt public need are two of the oldest competing interests—interests advanced, at different times, by both sides of the statute-common law divide. M. Horwitz, *The Transformation of American Law, 1780–1860* (1977) *passim.*

with EPA and DER, promptly to submit a proposed further Order (in alternative form if they cannot agree on a joint submission) outlining the long range steps defendants will be required to take to halt all leachate leakage from the landfill at the earliest possible date.

■ Claims for damages for emotional and physical distress, consequent upon the dismissed state law claims, will be denied. Plaintiffs' request for civil penalties under 33 U.S.C. §§ 1319(d) and 1365(a) will also be denied; those sums are better spent accomplishing the required remedial measures. Subsequent to the entry of the further Order referred to in the previous paragraph, claims for attorneys' fees will be addressed in supplementary submissions by the parties.

## ORDER

For the reasons set forth in the accompanying Opinion, (1) judgment is entered for plaintiffs and against defendants on the First, Second and Third Claims for Relief; and (2) judgment is entered for defendants and against plaintiffs on all other claims.

Defendants are hereby declared to be in violation of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*

Defendants are permanently enjoined from allowing leachate to escape the boundaries of Moyer's Landfill. To this end, defendants Paul Lanigan, Howard Moyer, Jr. and Moyer's Landfill, Inc. are directed to repair forthwith all damaged dirt berms, leachate collection tanks, basins and pits, seep collectors, pipes, pumps, and all other components of the leachate collection system.

Within two weeks of the date of this Order, the parties shall prepare a proposed Order detailing the steps defendants are to take permanently to halt the escape of leachate beyond the landfill's boundaries; the parties shall solicit the views of the Pennsylvania Department of Environmental Resources and the Environmental Protection Agency, and deliver the proposal to those agencies. A week thereafter, the proposed Order shall be submitted to this Court. The agencies are invited to submit memoranda and/or alternative proposed Orders together with the proposals of the parties.

The Clerk of Court is directed to serve copies of this Order and accompanying Opinion upon the Environmental Protection Agency, Region III, Philadelphia, and the Pennsylvania Department of Environmental Resources, Norristown, Pennsylvania.